IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF HINDRYK B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF HINDRYK B., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHERRI B., APPELLANT.

Filed January 24, 2017.    No. A-16-553.

Appeal from the County Court for Hitchcock County: ANNE PAINE, Judge. Affirmed.

Ashley K. Spahn, of Law Office of Ashley K. Spahn, for appellant.

D. Eugene Garner, Hitchcock County Attorney, for appellee.

Jordan J. Mruz, of Fye Law Office, guardian at litem.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

Cherri B. appeals from the decision of the county court for Hitchcock County, sitting as a juvenile court, terminating her parental rights to her son, Hindryk B. We affirm.

BACKGROUND

*Procedural Background.*

Cherri is the mother of Hindryk, born in 2008. Joshua B. is Hindryk's biological father and Cherri's ex-husband. Joshua's parental rights to Hindryk were terminated during these same proceedings. Because Joshua is not part of this appeal, he will only be discussed as necessary.

- 1 -

Hindryk was removed from his mother's care on October 8, 2014. Prior to removal, Hindryk and Cherri had been staying at the residence of Anthony H., a registered sex offender, for five days because the electricity had been shut off at Cherri's residence. On October 8, law enforcement executed a search warrant at Anthony's residence. Cherri was present when the residence was searched, and drugs and weapons were found. Cherri was arrested and charged with child abuse, a Class IIIA felony, and possession of methamphetamine, a Class IV Felony. Hindryk was in school at the time of the search, but was taken into temporary protective custody later that day. He has been in the custody of the Nebraska Department of Health and Human Services (DHHS) and in an out-of-home placement since removal on October 8.

During a forensic interview on October 9, 2014, Hindryk reported that Cherri smoked marijuana and he was able to make a replication of her marijuana pipe out of "play-doh." He was also able to describe marijuana in detail and reported that a person picks the plant, takes the leaves and then cooks the leaves in a microwave or oven, and then puts the cooked leaves into the pipe to smoke them--he called this "personal weed." A DHHS worker gave consent for Hindryk to have a hair follicle test. The test results received on October 16 confirmed that Hindryk had been exposed to both methamphetamine and amphetamines.

On October 10, 2014, the State filed a petition alleging that Hindryk was a child as defined by Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013) due to the faults or habits of his parents. In January 2015, the juvenile court adjudicated him to be within the meaning of § 43-247(3)(a), and ordered supervised visitation.

After a disposition hearing in February 2015, the court adopted the goals of the DHHS case plan dated February 6, and directed the parents to comply with the plan. The February 6 case plan set forth three goals for Cherri.

1. Cherri B[.] will refrain from any illegal substance use and address any drug issues as evidenced by submitting to random urinalysis testing, having zero positive tests, completing a drug and alcohol evaluation and following the recommendations of the drug and alcohol evaluation.

2. Cherri B[.] will ensure that she is meeting her own mental health needs as evidenced by attending and completing a Psychological Evaluation and following the recommendations of the evaluation. Cherri needs to understand how important her mental health concerns are.

3. Cherri will enhance her parenting skills as evidenced by participating in parent education as scheduled, providing age appropriate supervision during visitation, identifying appropriate consequences and rewards for Hindryk, and showing consistency in expectations and routine.

The plan provided for 20 hours of supervised visitation each week.

The court held review and permanency planning hearings in April, August, and November 2015, and in January 2016. The court adopted DHHS case plans at each of those hearings, and ordered all parties to comply with the terms of the plans. The case plan goals for Cherri remained the same throughout the course of this case. Additionally, in January 2016, the court approved a

request by Hindryk's guardian ad litem and the "CASA" that visits not occur if Cherri tested positive for methamphetamine.

On January 15, 2016, the State filed a motion to terminate Cherri's parental rights to Hindryk pursuant to Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016). The State alleged that: Cherri substantially and continuously or repeatedly neglected and refused to give the child necessary parental care and protection; Cherri was unfit by reason of habitual use of intoxicating liquor or narcotic drugs which conduct was seriously detrimental to the health, morals, or well-being of the child; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication; the child had been in out-of-home placement for 15 or more of the most recent 22 months; and termination was in the child's best interest.

*Adjudication and Termination Hearing.*

A combined adjudication and termination of parental rights hearing was held on March 30 and April 6, 2016. A summary of the evidence follows.

Several exhibits containing the case plans and court reports, visitation records, and drug test results were received into evidence and reveal the following. On October 8, 2014, a search warrant was executed on the home in which Cherri and Hindryk were staying. Drugs and weapons were found in the search. As a result, Cherri was arrested on October 8, 2014, and charged with child abuse, a Class IIIA felony, and possession of methamphetamine, a Class IV felony. Exhibits 68 and 69, journal entries from Hitchcock County District Court, were received into evidence and show that in April 2015, Cherri pled "no contest" to amended charges of attempted possession of methamphetamine and child abuse, both Class I misdemeanors, and was subsequently sentenced to 24 months' probation.

From October 27, 2014, to sometime in November 2014, Cherri resided with Hindryk's paternal great uncle at a residence in Trenton, Nebraska. Sometime in November, Cherri moved to Herndon, Kansas, and she lived there through March 2015. On April 1, Cherri moved to a residence in Culbertson, Nebraska, where she continued to live at the time of the termination hearing. All visits between Cherri and Hindryk occurred in Nebraska, either at his great uncle's home, Cherri's home, or a neutral location. The visitation records show that from November 2014 to September 2015, when Cherri entered inpatient drug treatment, Cherri was inconsistent with her visits. There were numerous occasions when she was late, canceled, or was a "no-show," all of which caused Hindryk to be upset.

Additionally, from November 2014 to September 2015, Cherri was subjected to numerous drug tests. Initially, the testing was done by urinalysis (UA), but Cherri reportedly had a "shy bladder" and was often unable to provide a sample or provided an insufficient sample. Numerous tests were presumptive positive for methamphetamine and/or amphetamines. And there were several positive drug tests confirmed by the lab. Eventually, Cherri's drug tests were done mostly by mouth swab. Cherri went to inpatient treatment in September 2015, but after her release in October she continued to test positive for drugs. Cherri tested positive for methamphetamine on November 3. She tested positive for amphetamines and methamphetamines on November 19 and 28, and December 19. On December 26 and 29, Cherri tested positive for amphetamines, methamphetamine, and marijuana. In 2016, Cherri tested positive for methamphetamine on

January 5. (And according to Exhibit 43, the Mediation Center Report, Cherri also tested positive for drugs on January 7, 14, and 16.) She tested positive for amphetamines and methamphetamine on March 12. And she tested positive for methamphetamine and marijuana on March 22 (just 8 days before the termination hearing began). There were other occasions since October 2015 that Cherri either was not home or did not answer her door when a worker attempted to drug test her, including on March 6 and 25, 2016.

James Taylor is a probation officer with the State of Nebraska, and supervises high-risk individuals. Cherri has been on his caseload for intensive supervised probation since June 1, 2015. According to Taylor, no probation violations have been filed nor any probation revocations initiated. During a meeting on March 9, 2016, Cherri admitted to Taylor that she had stopped complying with DHHS for the past several weeks.

Bethany Monnahan, a child and family services specialist with DHHS, was assigned to this case in October 2014, however, she first met Cherri in July 2014 regarding another intake (concerns about her mental stability, and the overall safety and condition of the home). Monnahan testified that in October, Cherri contacted Monnahan and requested information about homeschooling Hindryk as he had missed quite a few days and Cherri was having difficulty getting him to school on time. Monnahan walked her through what needed to be done in order to contact the Nebraska Department of Education. During that discussion, Monnahan also asked Cherri if she had filled out the DHHS application for services that had been given to her in July, but Cherri said she had not. The same day in October that Cherri contacted Monnahan, Monnahan was also contacted by law enforcement who wanted to make sure that Hindryk was in school because they were about to search the residence that he had been residing in. After law enforcement "raided" the residence, they informed Monnahan that Cherri had been arrested and charged with possession of methamphetamine and child abuse. The next day, Hindryk was given a hair follicle test, which was positive for methamphetamine and amphetamines.

Monnahan met with Cherri in November 2014, after Cherri bonded out of jail. Cherri said she had a mental health diagnosis that had gone untreated for a long period of time. She was a little guarded about her use of illegal substances. Cherri was willing to participate in parenting education and supervised visits.

Monnahan testified that after a disposition hearing in February 2015, Cherri was to have 20 hours of supervised visitation each week. She was also ordered to complete a psychological evaluation. Cherri was informed that she needed to fill out a budget in order for DHHS to assist with a letter of agreement assuming financial responsibility for the evaluation. However, Cherri did not complete the budget.

According to Monnahan, between February and April 2015, Cherri was given random UAs, but reported having a "shy bladder" and there were "quite a few occasions" when she was unable to produce a sample. When she could produce a sample, they were presumptive positive for methamphetamines. In April, Cherri completed her court-ordered drug and alcohol evaluation. She also began mental health counseling with Rebecca Durner.

Monnahan testified that between April and August 2015, Cherri made minimal progress. She had not scheduled her psychological evaluation and was still testing positive for methamphetamines. There were also concerns about Cherri canceling visits.

Monnahan stated that between August and November 2015, Cherri was participating in her mental health counseling with Durner, and was maintaining medication management, but she still had not completed a psychological evaluation. She was also testing positive for methamphetamines. Cherri did go to a dual-diagnosis treatment facility from September 3 to October 2. She did not receive an actual discharge plan from the facility because she left before their recommended 45-day time frame (Cherri had successfully completed 30 days of treatment as required by her probation, which was all the time that probation would pay for; she would have been financially responsible for any recommended treatment beyond 30 days). While in treatment, Cherri maintained daily phone contact with Hindryk. Visitation did not resume until October 14 or 15 because Cherri was trying to get herself established.

Monnahan testified that between November 2015 and January 2016, Cherri was participating in her mental health counseling with Durner, and was maintaining medication management, but she still had not completed a psychological evaluation. She was also testing positive for methamphetamines. Cherri had visitation with Hindryk, but canceled four times in November reporting illness. Based on the number of visits that were being canceled, and because she either showed up late or was a "no-show," it was decided on November 23, 2015, that Cherri would need to call and confirm visits two hours in advance.

Monnahan last had contact with Cherri on March 4, 2016. At that time, Monnahan asked Cherri to sign a release of information so that she (Monnahan) could share Cherri's psychological evaluation (which had finally been completed with Dr. John Striebel) with Durner. Cherri was not willing to sign the release and "basically stated that she was done with Ms. Durner in the aspect of both her relinquishment counseling as well as her mental health counseling." She said that Durner had "mind fucked" her. (Cherri testified that she never said that, but did say she was not going to play mind games with Durner.) Since March 4, Cherri had visits with Hindryk. She also complied with drug tests, but continued to test positive.

Monnahan testified that Hindryk has been in an out-of-home placement since October 8, 2014. His visits with Cherri have remained fully supervised. And throughout the life of the case, Cherri would do well keeping her visits for a period of time, and then she would "kind of go backwards" and miss a series of visits. Cherri has reported having various sporadic part-time jobs throughout this case. She relied on friends and family to pay her expenses. Although she has complied "to some degree" with addressing her mental health needs as well as her substance abuse needs, she has not followed through with addressing either as she is no longer attending any mental health counseling. Additionally, she reported to Dr. Striebel that she was not taking any of her prescription medication. Finally, she has continued to test positive for methamphetamines (as recently as March 22, 2016), and occasionally marijuana. Monnahan knew of no other services that Cherri could benefit from, other than returning to inpatient treatment. But "Cherri's been given the tools through the services provided by [DHHS]. And at this point, it's truly up to her not only as an adult but as a parent to make the decisions that she not only wants to address her mental health needs but that she wants to become substance free." Monnahan acknowledged that according to Durner, Cherri's progress was minimal and it could take years to address some of the mental health needs. Monnahan did not know how to gauge when Cherri will want to become

substance free. Monnahan's concern with giving Cherri more time, is "the impact that it's having on her seven-year-old son."

Durner, a licensed independent mental health practitioner, saw Cherri 28 times between May 15, 2015, and February 25, 2016. (Cherri also canceled nine times and had four "no-shows.") Durner testified that the primary focus of Cherri's counseling sessions was to deal with her anxiety, depression, and general mental health. Over the course of the case, Cherri was able to identify her anxiety "which was very predominant and affected most of her decision-making," and she was able to start putting in coping skills. Durner believed that Cherri made slow progress, but thought she had the ability to continue progress if she continued with counseling and working with the community support worker. However, the progress Durner was looking at would take "a couple of years." Cherri's February 25 appointment with Durner was supposed to be the first of six sessions related to relinquishment counseling. However, Cherri became agitated, decided that she did not want to continue, and left the office. Durner had not seen Cherri since that time.

Dr. Striebel, a licensed psychologist, conducted a psychological examination of Cherri on February 5, 2016. The evaluation report was received into evidence as exhibit 44. Based on the history presented by Cherri and by Monnahan, there have been some long-standing mental health concerns with Cherri such as schizophrenia or some other "significant mood variability." He thought Cherri continued to present with the schizophrenia that was diagnosed from early childhood. She had been prescribed different mood stabilizing medications, but was not taking them on a regular basis. (Cherri testified that Dr. Striebel never asked her about her medications and that they did not talk about medications.) Dr. Striebel testified that without the medication, Cherri would continue to struggle in her relationships with other people. In particular, she would be "very sensitive" to any kind of feedback about how she was doing and would have difficulty complying with DHHS directives on a long-term basis. Cherri felt that the drug testing professionals were working against her and were presenting her drug tests as positive when they were not. (In her testimony, Cherri denied making such statements and said that Dr. Striebel was "very untruthful" in his testimony.) Dr. Striebel recommended that Cherri remain under the direction of the court to try to comply with DHHS directives, take prescribed medications on a consistent basis, participate in individual therapy, abstain from alcohol and drugs, take parenting classes, and possibly "undergo some Workforce involvement." In his report, Dr. Striebel wrote, "if Cherri is not able to comply with the court directives and also with [DHHS] directives then it is unlikely that she will be able to successfully parent her minor child on a long term basis."

Various family support workers and family partners from Owens and Associates testified that they supervised visits between Cherri and Hindryk and they performed drug tests on Cherri. They testified there were times when Hindryk had to be coaxed into going to visits. There were also times Cherri was late, canceled, or was a "no-show" for visits. The workers testified that drug tests were performed either by UA or a mouth swab, and there were several times when Cherri was unable to produce a sample for the UA.

Danielle Dooley, a family support worker, testified that she also did family support sessions with Cherri, during which they worked on parenting education. There were "about five no-shows" and Dooley could not recall how many cancellations there were. The parenting curriculum addressed communication, time outs, and consequences. Cherri would often write notes, and

Dooley believed that Cherri understood what was being taught. During visits, Cherri would attempt to use the parenting steps, but was inconsistent and did not follow through. However, the January 2016 case plan and court report reveals that at a meeting with Monnahan on November 10, 2015, Cherri reported that she did not feel as if she was absorbing any of the information being taught to her during parent education as she did not feel she could apply the techniques during visits. Cherri advised that each time she met with the family support worker for parent education, it always felt like it was the first time she was being taught.

Cindy H. is Hindryk's foster mother. She is a part-time educational consultant for the Nebraska Community Schools Association and a retired superintendent, principal, and teacher. Cindy testified that Hindryk is very independent and "just kind of takes care of himself." When Hindryk first came to live with her, he asked if he could call her "mommy." Cindy told him no, because he already had a mommy that loved him. For a long time, Hindryk had extreme behaviors. For example, he would "get so mad and he would run to the bedroom, slam the door, tear off all the covers off the bed, sometimes throw the clothes out of his closet." And after returning from visits with Cherri, Hindryk had negative reactions. For instance, he would yell without knowing why he was doing it. The negative reactions lasted up until the time that Cherri went to treatment in the fall of 2015.

When Cherri was in treatment in the fall of 2015, Hindryk became much calmer and more relaxed. He asked where Cherri was, and when Cindy said that Cherri was getting help, Hindryk responded "Well, I hope -- I hope she does it. I hope she does it." He is "very, very protective" of Cherri and does not want anything bad to happen to her. When Cherri was in treatment she would call Hindryk on a consistent basis, usually every day. After Cherri came back from treatment, Cherri still called Hindryk, but not as frequently or as consistently, and the calls were much shorter. Furthermore, after Cherri left treatment there was a "little more anger" and frustration from Hindryk. He gets frustrated when Cherri does not come to a visit, "he's mad and then he doesn't want to go" to the next one. According to Cindy, Hindryk "thrives" when there is structure, and that includes consistency.

Cindy also testified that initially, Hindryk struggled in school and "he wasn't cognitively developed enough for first grade learning." Cindy worked with him on prereading skills and he did not make progress at first. Everyone, including Cherri, agreed that Hindryk should repeat first grade and it has been a "very positive thing for him." Katie Andrews, Hindryk's therapist, agreed that he views school as a very positive experience now, which was not the case previously.

Andrews, a licensed independent mental health practitioner, began working with Hindryk in February 2015. In the beginning they met "every couple weeks," but since about April of that year, they have been meeting weekly. Hindryk has a lot of anxiety, so they have worked on identifying triggers that lead to negative reactions. One of his major triggers is conversations about Cherri; several times, mostly toward the beginning of therapy, Hindryk would have a bowel movement in his pants during conversations about her. Although he has "come a long ways within the last year"--no longer has bowel movements in his pants, is able to talk about emotions and feelings, and feels more empowered--there is still a long ways to go. Hindryk wants to know what is going on and has "really big concerns of knowing what to expect and what's expected of him as well."

According to Andrews, when Cherri was in a treatment facility in the fall of 2015, Hindryk was initially worried that she would quit and not follow through with it. After she completed a week, he was excited, relieved, and thankful that he did not have to worry about things right now (e.g. like whether he was going to have a visit or not). During Cherri's treatment, Hindryk knew he was not going to have a visit and his sessions appeared to go better. Once Cherri got out of treatment, there was a little bit of regression because Hindryk was more concerned about his mom and what his expectations would be.

Andrews authored a report dated February 17, 2016, which was received into evidence as exhibit 55. In that report, Andrews wrote:

Hindryk could best be described as a child whom has experienced a lot of trauma in his past. Since the beginning of therapy, Hindryk participated in a period of 3 months of trauma informed focus before Hindryk could talk about his Mother without having an adverse reaction of defecation. Following that situation of treatment, anxiety has been reduced to help Hindryk maintain an appropriate demeanor and generalized thought process throughout sessions. He often speaks in an even tone, and presents in an intelligent manner for stated age, however demonstrated several behaviors of growling, screaming, kicking, and sabatoshing [sic] his surroundings during the first 9 months of treatment. . . .

Presently within the last month, Hindryk has initiated significant regressive behaviors through report of school and therapy sessions. He has demonstrated more defiance and acting out behaviors that were similar to initial counseling sessions, which include a significant increase in verbal and physical aggression, struggles to concentrate as well as interact positively with peers and family/foster team members. Hindryk reports that he is "very stressed" and verbalizes frustrations with permanency planning as signified through inconsistent visitation and expectations of his current situation.

Visitation summaries received into evidence reveal the following. In January 2016, visits were canceled on January 9, 11, and 23 because Cherri did not call and confirm. Cherri canceled on February 4 because she would not make it back from an appointment in time. She canceled on February 5 and did not show up for a visit on February 17. Visits were canceled on February 21 because Cherri did not call and confirm two hours in advance, and on February 24 because Cherri's car broke down while she was out of town. A visit was also canceled on March 6 because Cherri did not call and confirm two hours in advance. When visits did occur, Cherri and Hindryk enjoyed spending time together. They did homework, went bowling, played guitar, played outside, did yard work and gardening, played with the dog, played video games, watched movies, and ate meals together. Cherri and Hindryk showed love and affection for one another.

Daniel Schartz was a Catholic priest for 10 years and was currently employed as a family partner with Owens and Associates. He has worked with Cherri since December 2015 and testified that Cherri has complied with every request he has made of her and has been very open to any suggestions and recommendations. Schartz and Cherri were "right in the middle" of trying to develop job acquisition skills and developing her resume and cover letter, when they learned at the end of February 2016 that DHHS was no longer going to provide family support to her. Schartz

thought he could have secured a job for Cherri in the "next month or two" and also "developed a career path" for her so that she would not go from job to job.

Schartz had recently supervised visits between Cherri and Hindryk over a 4-month period, and Cherri never canceled. He was also able to review Owens and Associates' records from November 1, 2015, forward, and said that since that time there were 283 visits, of which Cherri made 80 percent of them. (We note that it was not possible to have 283 visits in the 5-month period from November 1, 2015, to the time Schartz testified on April 6, 2016. Accordingly, this court construes Schartz' testimony to mean that there were 283 visits since November 1, 2014.) Schartz observed Cherri help Hindryk with his homework and she was very patient and understanding. Cherri's home was clean and she provided nutritious meals for Hindryk. Schartz observed Dooley and Cherri during visits, and thought that Dooley was irritated by Cherri and that she "seemed to be looking for things and sort of nitpicking things."

On cross-examination, Schartz testified that "[h]abits that would hinder people from being parents would be domestic violence, drug addiction, alcoholism," but "[w]ith the right support group, I think they can make it." Schartz "[a]bsolutely" saw progress from Cherri from December of 2015 until the time of the termination hearing. He acknowledged that Cherri was late for a visit on March 5, 2016, and that she tested positive for drugs on March 12. And Cherri told Schartz she did not think the drug tests were accurate and she thought the people administering the test were out to get her.

Cherri testified that she called Monnahan in October 2014 seeking assistance. She asked for a referral because her electricity had been shut off. Cherri was also concerned because Hindryk was late to school a lot and missing too many days, so she asked Monnahan about homeschooling options. Cherri reached out for help, but in retrospect does not feel like she received help.

Cherri's case plan and court reports throughout this case set specific goals for her to stop using drugs, address her mental health needs, and enhance her parenting skills. To address her drug use, Cherri went to inpatient treatment, attended AA, and changed the people with whom she associates. She has followed all the terms and conditions of her probation and is regularly drug tested. However, on cross-examination, she said she did not know that one of the terms of her probation was that she was not to have contact with anybody with a criminal record. She then acknowledged that she and her friend Rachel Hurst had paraphernalia and shoplifting charges together; Cherri and Hurst lived together at various times throughout this case and were living together at the time of the termination hearing. She further claimed not to know until two weeks prior to her testimony that two other people she knew, Rodney and Roger Lorentz, had been charged with possession of methamphetamine with intent to deliver in Kansas. She receives financial assistance from Hurst, had been employed by Roger Lorentz while living in Kansas, and regularly borrowed vehicles from Rodney Lorentz.

Cherri testified that she "never once" verbally refused a UA. She feels "[u]nder pressure" being watched during a UA and said, "[i]t's seriously affected me psychologically, without a doubt. It's very inhumane." She has also done mouth swabs, but each worker does them differently. For example, prior to December 2015, there was never a waiting period prior to doing the test. And then some of the workers required her to hold the swab in her mouth for 5 minutes, others required 10 minutes or more. Cherri acknowledged that since November 2014, not all of her drug

tests have come back negative. She is on probation for at least another year and intends to maintain all of her probation requirements. Cherri is committed to sobriety for her future.

To address her mental health needs, Cherri goes to counseling with Durner, started seeing Kathy Batson for medication management in August 2015, and completed a psychological evaluation with Dr. Striebel. Cherri would like to continue mental health counseling with Durner, and said, "I haven't canceled her at all[,] I mean, I've canceled appointments here recently but just because of the stress I've been under."

To enhance her parenting skills, Cherri worked with family support. Cherri testified that in January and February 2016, Schartz was helping her create a budget, work on her resume, and set forth specific goals to work on. No other family support worker had helped her with a budget or to find employment since March 2015. Furthermore, until Schartz, Cherri did not know that the family support workers had goals outlined for what they intended to teach her--she just thought they were there to supervise visits.

During visits with Hindryk, if it is an after school visit, Cherri helps him with his homework, they play, and then make dinner before he has to leave. On weekends, they play outside, play games, and do any "awesome, crazy activity." Cherri also has Hindryk do age-appropriate chores (e.g. taking out the trash, taking dishes to the sink, cleaning the litter box), and he gets rewards once he has completed the chores.

Cherri testified that she has lived at her current residence since April 2015 and has been able to maintain utilities, except when she went to treatment. She continued to seek employment, but "[w]ith all of the [DHHS] requirements as far as mental health and the psychological evaluation, with my criminal case, with probation[,] [i]t's really been a nightmare scheduling." Those requirements, as well as visitations, have caused difficulty in obtaining employment because she has limited availability. As stated previously, she receives financial assistance from Hurst, and borrows a vehicle from one of the Lorentzes. Cherri testified that she wants whatever is in Hindryk's best interest, "no matter what that is." She does not want him "to be left up in the foster care system just hanging."

*Juvenile Court's Decision.*

In an order filed on May 3, 2016, the juvenile court terminated Cherri's parental rights to Hindryk pursuant to § 43-292(2), (4), (6), and (7), and found that termination was in the child's best interest. Cherri has timely appealed the juvenile court's order.

ASSIGNMENTS OF ERROR

Cherri assigns that the juvenile court erred in: (1) finding grounds existed to terminate her parental rights under § 43-292(2) and (6), and (2) finding it was in the child's best interests to terminate her parental rights.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Cherri's parental rights to Hindryk, the juvenile court found that Cherri substantially and continuously or repeatedly neglected and refused to give the child necessary care and protection (§ 43-292(2)); Cherri was unfit by reason of habitual use of intoxicating liquor or narcotic drugs which conduct was seriously detrimental to the health, morals, or well-being of the child (§ 43-292(4)); having determined that the child was a juvenile as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the determination (§ 43-292(6)); and the child had been in out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

Cherri does not appeal statutory grounds under § 43-292(7); Hindryk has been in an out-of-home placement continuously since October 8, 2014. At the time the motion to terminate parental rights was filed on January 15, 2016, he had been in an out-of-home placement for 15 months. At the time the termination hearing began on March 30, Hindryk had been in an out-of-home placement for 17½ months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Cherri's parental rights under § 43-292(7) were proven by sufficient evidence.

Accordingly, we need not consider whether termination of Cherri's parental rights was proper pursuant to § 43-292(2) and (6) as assigned by Cherri, nor do we need to address § 43-292(4) which Cherri did not appeal, since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S.*, *supra*. Thus, the next inquiry is whether termination is in the child's best interests.

*Best Interests*.

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M., supra*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *Id*. Parental unfitness means a personal

deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

There is no doubt that Cherri and Hindryk love one another and enjoy spending time together. Their bond is apparent. But, our Supreme Court recently stated that a parental bond does not make the parent a fit person to provide parental care for their child. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Hindryk was removed from Cherri's care in October 2014, after the home in which they were staying was searched and drugs and weapons were found. During a forensic interview, Hindryk was able to give a detailed description of marijuana and how it is consumed. Hindryk's hair follicle test confirmed that he had been exposed to both methamphetamine and amphetamines. Cherri was criminally charged and ultimately pled "no contest" to amended misdemeanor charges of attempted possession of methamphetamine and child abuse for which she was sentenced to 24 months' probation.

Throughout this case, Cherri has repeatedly tested positive for methamphetamine, amphetamines, and marijuana. Her positive drug tests continued even after her 30-day stay at an inpatient treatment facility in the fall of 2015. She even tested positive for methamphetamine and marijuana on March 22, 2016, just 8 days before the termination hearing began. Although Cherri calls into question the testing procedures for the mouth swab because different procedures were used at different points in time, the juvenile court found that no evidence was presented to show that the test results were invalid. We agree. Furthermore, Cherri did not appeal the juvenile court's finding that Cherri was unfit by reason of habitual use of narcotic drugs, which conduct was seriously detrimental to the health, morals, or well-being of Hindryk (§ 43-292(4)).

In addition to her positive drug tests, there were numerous occasions in the months leading up to the termination hearing when visits did not occur because Cherri either canceled or failed to show up for scheduled visits, or because Cherri failed to confirm her visits or did not do so in a timely manner. The canceled visits understandably upset Hindryk. The foster mother testified that Hindryk "thrives" when there is structure, and that includes consistency. According to Andrews, Hindryk's counselor, Hindryk wants to know what is going on and has "really big concerns of knowing what to expect and what's expected of him as well." In her February 2016 report, Andrews wrote, "Hindryk reports that he is 'very stressed' and verbalizes frustrations with permanency planning as signified through inconsistent visitation and expectations of his current situation."

In his report, Dr. Striebel wrote, "if Cherri is not able to comply with the court directives and also with [DHHS] directives then it is unlikely that she will be able to successfully parent her minor child on a long term basis." Cherri's probation officer testified that during a meeting on March 9, 2016, Cherri admitted that she had stopped complying with DHHS for the past several weeks.

Both Monnahan and Durner testified that Cherri had made some progress, but that such progress was minimal and slow. Hindryk deserves permanency. At the time of the hearing,

Hindryk had been in an out-of-home placement for 17½ months. During that time, Cherri had not even progressed to being allowed unsupervised visitation with Hindryk. Cherri still has a lot of progress to make before she can be trusted with Hindryk's care and custody. And there is no way of knowing when, or even if, Cherri might be able to overcome her drug habit, which has been a significant barrier to her reunification with Hindryk. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness. We further find that there is clear and convincing evidence that it is in Hindryk's best interest to terminate Cherri's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Cherri's parental rights to Hindryk.

AFFIRMED.